J-S71045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF J.W.K., III | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W.K., II, NATURAL FATHER | No. 1197 WDA 2015 |

Appeal from the Order Entered July 15, 2015
In the Court of Common Pleas of Cambria County
Orphans' Court at No(s): No. 2014-987-IVT

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED JANUARY 20, 2016**

J.W.K., II, Natural Father (Father), appeals from the order entered on July 15, 2015, in the Court of Common Pleas of Cambria County, that terminated his parental rights to his son, J.W.K., III (Child), born in June, 2011.[1]  Father raises four issues, claiming the orphans' court abused its discretion in terminating his parental rights (1) pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) in the absence of clear and convincing evidence, (2) pursuant to 23 Pa.C.S. § 2511(a)(1) where evidence was presented that he repeatedly tried to perform his parental duties, (3) pursuant to 23 Pa.C.S. § 2511(a)(2) where evidence was presented that he remedied his situation and has the present capacity to care for Child, and (4) pursuant to

_____

[1] By the same order, the court terminated the parental rights of Child's mother.  This appeal is taken by Father only.

23 Pa.C.S. § 2511(b) where evidence was presented that established the child had a close bond with Father. *See* Father's Brief at 3. Based upon the following, we affirm.

On October 27, 2014, Cambria County Children and Youth Service ("CYS") filed a petition to terminate Father's parental rights to Child. The evidence showed that Child was born in June, 2011. Almost one year later, on June 6, 2012, the Johnstown Police Department ("JPD") responded to a report of domestic violence at the family residence. Both Mother and Father were highly intoxicated. The JPD found three marijuana plants in the home. As a result of the incident that day, the JPD arrested and jailed Child's mother and Father. N.T., 1/7/2015, at 9. On June 7, 2012, Child was removed from parents' care. *Id.* at 8, 11. In September, 2012, Father tested positive for opiates, and entered an outpatient drug and alcohol treatment program through Twin Lakes. *Id.* at 38. *See also id.* at 54. Father successfully completed the program on February 19, 2013, but his prognosis was "guarded." *Id.* at 61, 65; Petitioner's Exhibit 5 (Letter, 2/19/2013). Meanwhile, on January 29, 2013, Child was returned to Father's care.[2, 3] *Id.* at 11.

---

[2] "Mother remained incarcerated until March 2014 for various drug and alcohol offense[s] as well as copper wire theft." Orphans' Court Opinion, 7/15/2015, at 2 n.1.

[3] The reason for Child's return was "That the child was smacked by his current foster parent, and instead of removing [Child] to another foster
*(Footnote Continued Next Page)*

Thereafter, Father was incarcerated from May 1, 2013, to August 1, 2013.[4]  *Id.* at 17.  During that time, Father's mother cared for Child.  *Id.* at 18.  On August 21, 2013, because Father was doing well, CYS was about to recommend case closure. *Id.* at 23–24.   However, it was requested that Father take a drug screen and Father tested positive for opiates.  *Id.* at 24.  Then, four days later, on August 25, 2013, Father was charged with driving under the influence (DUI), and driving under a suspended license.[5]   *Id.* at 36.   CYS continued to provide services to Father, and Child remained in Father's care.  *Id.* at 36, 50.   However, on March 7, 2014, CYS removed Child from Father's care because Father was facing incarceration on the DUI and driving without a license charges, and CYS was looking for a kinship placement for Child.  *Id.* at 14–15.   Child was placed with a foster family and remained in the same foster home at the time of the termination hearing.  *Id.* at 15.

Father returned to Twin Lakes for an assessment in March, 2014, prior to his incarceration in April, 2014.  *Id.* at 29.  Father was incarcerated from April, 2014, through August, 2014.  *Id.* at 18.  On August 15, 2014, a goal

_(Footnote Continued)_ ────────────

home the agency decided it would be in his best interest to live with his father and have the child returned home."  N.T., 1/7/2015, at 11.

[4] This incarceration stemmed from a conviction for theft of copper wire.  *See* N.T., 2/11/2015, at 81, 102.

[5] The DUI offense occurred in Somerset County and was a second offense.

change hearing was held, and the goal for Child was changed from reunification to adoption. *Id.* at 16. Shortly thereafter, Father was released from prison, and he returned to treatment at Twin Lakes. However, Father had an unsuccessful discharge from Twin Lakes in November, 2014, because of attendance issues. *Id.* at 29–30, 70.

On October 23, 2014, CYS petitioned for involuntary termination of Father's parental rights. Father was served with the termination petition on December 17, 2014, *id.* at 13, and the hearing on the petition occurred on January 7, 2015, and February 11, 2015. After transcripts were filed, the court permitted the parties to file memoranda and all did so. The orphans' court, on July 15, 2015, issued an opinion together with the order presently under appeal. With regard to Father, the court found:

> On August 15, 2014, the goal was changed to permanency through adoption. The CYS caseworker summarized the reason for the goal change: "the parents were not compliant with the permanency plan; the parents had been in and out of jail; the services had been provided to the family since, as stated before, June 2012; the parents did not comply with recommendations; parents cannot control their drug and alcohol abuse, and they have not maintained a safe and secure residence for the child." (Transcript 1/7/2015, Page 17).
>
> Father and [Child] do have a bond. Notwithstanding that bond, Father continued to consume alcohol, make poor decisions, and get in trouble with the law. Father contends, however, that despite all of this, his actions never directly placed the child in harm.
>
> CYS social worker Gina Saly's [sic] refutes that position. She stated that things had deteriorated due to [Father's] extensive criminal history, he often served jail time for any additional offenses. When this occurs, [Father] is physically unable to care

for his son and his son must be cared for by another family member or end up in agency care for the length of time that [Father] is incarcerated. These continued placements may be detrimental to [Child's] behavioral, emotional, and cognitive development. Further, [Father] does not take any responsib[ility] for the poor decisions that he makes. Therefore, he does not recognize this as an issue or understand the need for him to make positive changes. An example of this include[s Father's] unsuccessful discharge from Twin Lakes Center for attendance issues in November of 2014.

Orphans' Court Opinion, 7/15/2015, at 2–3. The court ordered Father's parental rights terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). This appeal followed.[6]

At the outset, we state the principles that guide our review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[6] On July 30, 2015, Father filed the notice of appeal, and contemporaneously filed a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 905(a)(2), 1925(a)(2)(i). On the same date, the trial court issued an order pursuant to Rule 1925(a), relying on its Order and Opinion of July 25, 2015.

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938 which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

As stated above, the orphans' court found grounds for termination of Father's parental rights based upon Section 2511(a)(1), (2), (5), (8), and (b). Section 2511 provides, in relevant part:

**§ 2511.  Grounds for involuntary termination.**

**(a)  *General rule. –***

> The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

****

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

****

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

****

(b) *Other considerations*. –

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any

petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have [her] parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

* * *

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re N.M.B.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

- 8 -

Father first argues that the court abused its discretion in terminating his parental rights under Section 2511(a) in the absence of clear and convincing evidence. *See* Father's Brief at 9. Father argues that the orphans' court's opinion cites CYS caseworker, Lauren Keselyak's opinion regarding both parents, and that the court comingled the facts of Child's mother's situation with that of Father and did not evaluate Father's situation independently. *Id.* at 10–11. Father further claims the court, in referring to Father's "extensive criminal history," mischaracterized the testimony of Cambria County social worker, Gina Saly, who testified Father "was facing sentencing for some other charges, so we knew that [Child] was going to have to have to be placed due to his incarceration because he didn't have any family members at that time that were appropriate and able to take him." *Id.* at 11, *citing* N.T., 2/11/2015, at 41. Father argues the court did not examine his actual incarceration history, totaling seven months and seven days by way for three separate commitments,[7] during the entire time of CYS involvement and the termination case, which was a period of over two and one-half years.[8] *See* Father's Brief at 12. Father contends the court cannot terminate his parental rights on grounds of abandonment

---

[7] *See* Father's Brief at 12. *See also*, N.T., 2/11/2015, 90–91 (2012 — seven days; 2013 — 3 months; 2014 — 4 months).

[8] CYS involvement started in June, 2012, and the termination hearing began on January 7, 2015.

where he sent cards, letters and pictures to Child while in prison, and has consistently utilized the available resources to maintain a place of importance in Child's life. He further argues that despite his relapses following successful drug and alcohol treatment, he took affirmative steps to return to treatment and has been sober since April 11, 2014, more than six months preceding the filing of the involuntary termination petition. *Id.* at 12.

Initially, we point out that "we need only agree with [a orphans' court's] decision as to any one subsection [of 2511(a), along with 2511(b),] in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we address the trial court's decision to terminate Father's parental rights based upon Section 2511(a)(5).

We review the evidence to support the involuntary termination of parent's rights pursuant to Section 2511(a)(5) as follows:

> In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1273–74 (Pa. Super. 2003).

The evidence in this case showed that Father does have a lengthy criminal history,[9] and, within the period of CYS involvement from June, 2012, to the filing of the termination petition in October, 2014, Father had three separate periods of incarceration, and a parole revocation petition was pending.[10]  The evidence also shows Father's substance abuse.  Because of incarceration and substance abuse, Child was removed from the parents'

_____

[9] **See** Petitioner's Exhibits 3 and 4.  Father's criminal history prior to 2012 includes the following: (1) 2001 sentence for criminal conspiracy to commit theft by unlawful taking – 23 months' probation, (2) 2003 sentences for simple assault – 2 years' county probation; defiant trespass – 1 year consecutive county probation, (3) 2006 sentence for arson and related offenses – county prison for not less than 1 year less a day nor more than 2 years less a day, (4) 2009 sentences for criminal mischief – 90 days' county probation; disorderly conduct – 90 days' consecutive probation; small amount of marijuana – 30 days' consecutive probation.  Father's record also reflects several probation violations.  In addition, Father was placed on ARD for a DUI—1st offense in 2011.  Father was placed on ARD in 2000 for a DUI offense.

[10] A parole revocation petition was been filed on September 17, 2014, in Somerset County, in Father's August, 2013, DUI/driving under suspended license case.  The petition alleged the following violations:

> Special condition 1-1 – Alcohol Safe Driving School
> Special condition 1-2 – drug and alcohol treatment
> Special condition 1-3 – victim impact of DUI panel

**See** N.T., 1/7/2015, at 73.  The petition also alleged nonpayment.  **Id.** However, on December 3, 2014, the parole department recommended a continuance of the case for six months to give Father time to meet, and provide documentation for, the special conditions of his parole.  The trial judge granted the request for a continuance, and gave the probation office discretion to reschedule the hearing at any time.  **See** N.T., 1/7/2015, at 73–74, 78–80.

care in June, 2012. Child was returned to Father on January 29, 2013, but was cared for by Father's mother when Father was incarcerated from May to August of 2013 on a theft charge. Child was removed from Father in March, 2014, when Father again faced incarceration for DUI/driving under suspension charges. Child has not since returned to Father's care.[11]

At the January, 2015, termination hearing, CYS caseworker Keselyak testified that after Child's January, 2013 return to Father, Father

> totally backslid, [and] he is not able to take care of his son right now. He continues to make poor decisions and be in denial of his substance abuse issues. He is not able to – I do not feel he is able to take care of his son and meet his needs.
>
> ****
>
> [Father] is in denial of his issues. He is in denial of his substance abuse. He states he already did treatment. Basically he went through the motions and did complete treatment at Twin Lakes once, but he continues to relapse and use drugs and alcohol.

N.T., 1/7/2015, at 30–31.

In addition, Keselyak testified on cross-examination by Father's attorney:

---

[11] Based on the evidence presented in this case, Child, whose birth date is in June of 2011, was almost 12 months old when he was removed from parents' care on June 7, 2012. Child was returned to Father's care on January 29, 2013, at which time Child was 19½ months old. Child was removed from Father's care on March 7, 2014, when Child was 32½ months old.

Q Did you discuss with [Father] on December 17[, 2014 — the date Father was served with the termination petition] that it would be beneficial to him to seek drug and alcohol services?

A Yes.

Q And did he indicate to you he was doing that?

A No, he did not.

*Id.* at 44.

Keselyak stated that Father's August, 2013 relapse "wasn't [Father's] only relapse." *Id.* at 45. She explained:

Although [Father's] drug screens were clear, [Father] did get into an argument and police were involved in December of 2013 regarding an argument between him and a [] woman, [at] the house he was staying at the farm in Hollsopple. Also, there were reports of him drinking Christmas Eve of 2013. [O]n February 21st, 2014, myself and another agency social worker were at [Father's] home. He had a strong odor of alcohol to him. He admitted that he walked up to Pizza-Deli Six Pack, purchased beer, and walked up the hill and drank it. He admitted to relapsing several times. He admitted to drinking throughout case involvement.

*Id.* at 45–46.

Keselyak testified that Father has continued to show the same pattern of behavior since case involvement in 2012. N.T., 2/11/2015, at 26. She stated that after the August, 2014, goal change, Father "was unsuccessfully discharged from treatment due to violation of the attendance policy." *Id.*, at 35. She was not aware of any additional drug and alcohol treatment after that discharge. *Id.*

David Knisely, outpatient supervisor at Twin Lakes, likewise testified that Father was unsuccessfully discharged from Twin Lakes in November, 2014, for attendance issues, and has not been readmitted to the program. *See* N.T., 1/7/2015, at 70. He testified:

> We have an attendance policy if you miss more than two appointments then you're subject to the attendance policy, and that's either no-shows or cancellations. I understand he had more than two missed appointments, and even after discussion with the counselor or other forms of communication by letter or call still continued to have attendance issues which led to the unsuccessful discharge.

*Id.* at 70. Under cross examination by Father's counsel, Knisely also stated, "I'm not aware of any medical issues or any work[-related] issues. Typically when a person is unsuccessfully discharged because of attendance we do take those things into account." *Id.* at 71.

Monica Rudolph, Father's probation officer in Cambria County, also testified regarding Father's ongoing drug and alcohol consumption. Specifically, she stated:

> [O]n the 26th of February [2014] I had gone to [Father's] residence with Probation Officer Rick Rok. We had breathalyzed [Father], he was negative. However, he tested positive for marijuana at that time. We also had taken photos of empty beer cans on the porch for evidence. We then went to his house on March 4th [2014] and breathalyzed [Father] again at 9:15 in the morning and he blew a .056. At that time, I intended to file a violation hearing, however, he had been incarcerated at that time so it was still pending.

- 14 -

*Id.* at 82. *See also id.* at 83. On cross examination, she testified that the day before the termination hearing she had drug-tested Father and breathalyzed him and the results were negative. *Id.* at 84.

Angelique Hutchinson of the Conemaugh Township Police Department testified that she investigated Father's August 13, 2013, incident, which resulted in charges for DUI and driving under suspension, and she also investigated a December, 2013, incident, involving Father. The December, 2013 incident, involved a verbal altercation between Father and a woman at the farm where Father was living. Officer Hutchinson testified she observed that Father and the woman were both under the influence of alcohol. *Id.* at 87.

Cambria County social worker, Gina Saly, testified regarding Father's progress. She stated that by February of 2014 Father

> had made progress in his goal of parenting. He really did well with parenting. I can't say he didn't. However, he did continue to make poor decisions. And I am not sure that he ever grasped that he actually had an alcohol problem because he didn't seem to cease those activities.

N.T., 2/11/2015, at 40. Later, in Saly's direct testimony, the following exchange occurred between the CYS attorney and Saly:

> Q Then based on when you last worked with [Father] which would have been in March of 2014, did you foresee within a reasonable period of time at that time he would be able to achieve a position in his life where he would be able to be a primary caregiver of this child?
>
> A He was facing sentencing for some other charges, so we knew that [Child] was going to have to be placed due to his

- 15 -

incarceration because he didn't have any family members at that time that were appropriate and able to take him. So physically at least twice I worked with him, he had periods of incarceration that caused [Child] to be out of his home. That's largely for the child obviously an issue. He is very bonded with his son, but every time you move the kid out of his home, it is stressful and traumatic for him. The reasons he had those periods of incarceration were due to making poor decisions, continuing drinking, getting arrested, getting charged, and having to, you know, finish up his sentence.

*Id.* at 41.

Father testified that he obtained employment three days after his release from prison. N.T., 2/11/2015, at 88. He stated he had been sober since before he was incarcerated on April 11, 2014. *Id.* He also testified that he attended AA meetings on Monday nights, and tried to attend a Friday meeting. *Id.* at 88. He stated he went to Somerset County Drug and Alcohol and had an evaluation the previous week. *Id.* at 88–89. Father also testified that he had asked CYS for additional time to visit Child, and this request was denied. *Id.* at 89.

Father stated while in prison he sent Child cards and letters for the foster parents to read to him. *Id.* at 90. Father recalled he once walked overnight from Somerset County to Johnstown for his monthly visit with Child because he had no transportation. *Id.* at 91–92. He testified he loves Child "with all my heart." *Id.* at 94. Father stated he can provide for Child, and he keeps going to meetings for his drug and alcohol issue. *Id.* He stated that he was discharged from Twin Lakes in November, 2014, because

the hotel where he worked was very busy and so he missed a couple of meetings. *Id.* at 106.

Having carefully reviewed the record, we agree with the orphans' court that the evidence satisfies grounds for termination of Father's parental rights pursuant to Section 2511(a)(5).

First, the evidence showed that Child was most recently removed on March 7, 2014, and therefore Child has been out of Father's custody for well over six months at the time the termination petition was filed on October 23, 2014.

Secondly, the evidence showed the conditions that led to removal still exist. Here, Child was removed from parents' care in June, 2012, when parents were found intoxicated and in possession of marijuana plants. Child was returned to Father in January, 2013, but removed a second time, in March, 2014, when Father was facing incarceration for his DUI/driving under suspended license charges. Father was released from prison in August, 2014, and was unsuccessfully discharged from substance abuse treatment at Twin Lakes in November, 2014, for attendance issues. Father testified his discharge was work-related, and he was "trying to get back in there." N.T., 2/11/2015. However, Father's explanation does not refute CYS's evidence regarding the unsuccessful discharge. Moreover, to the extent that a parole revocation petition is pending, Father faces possible re-incarceration for issues regarding drugs and alcohol. *See* Footnote 10, *infra*.

Additionally, it was reasonable for the court to determine that Father will not, or cannot, remedy the condition which led to the removal within a reasonable time.[12] CYS caseworker Keselyak testified Father is "in denial" of his substance abuse problem. N.T., 1/7/2015, at 30–31. As discussed, the evidence shows that after the goal change, Father missed appointments at Twin Lakes, resulting in his unsuccessful discharge in November, 2014.

Next, the evidence demonstrated that service or assistance which are reasonably available are not likely to remedy the conditions which led to the removal within a reasonable time. The evidence shows that over the more than two year period of CYS involvement, the substance abuse program in which Father participated yielded only temporary improvement. Again, the evidence demonstrates the "reasonable time" element is not met here.

Finally, the evidence showed that termination would best serve the needs and welfare of Child as Child has been removed twice from Father's care, with the most recent removal in March of 2014, and is in need of a stable home. Therefore, we reject Father's Section 2511(a) argument.[13]

_____

[12] "The 'reasonable time' requirement is intended to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families[.]" **In re N.C.**, 763 A.2d 913, 918 (Pa. Super. 2008).

[13] As stated above, "we need only agree with [a orphans' court's] decision as to any one subsection [of 2511(a), along with 2511(b),] in order to affirm the termination of parental rights." **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Based on our resolution of Father's first argument,
*(Footnote Continued Next Page)*

Next, we address 23 Pa.C.S. § 2511(b). After the court makes a determination that grounds for termination of parental rights exist under Section 2511(a), the court must consider whether termination serves the needs and welfare of the child, pursuant to Section 2511(b). **Adoption of C.L.G.**, 956 A.2d 999, 1009 (Pa. Super. 2008).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the orphans' court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the orphans' court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

_(Footnote Continued)_ ⸺⸺⸺⸺⸺⸺⸺

we need not address his second and third arguments, that deal with termination pursuant to Section 2511(a)(1) and (2), respectively.

Regarding the bond between Child and Father, the orphans' court

stated in its order:

> Although a bond does exist between this parent and the child, based on prior history, he is not yet prepared to assume custody and control of the child and the child is entitled to escape from "foster home drift." The Court is concerned about the safety of the child and has considered security, stability, love, and comfort that the child now has and is convinced that the bond with [F]ather can be severed without detrimental effect on the child who has been in foster care for three of his four years of life.[14]

Order, 7/15/2015, at 2, ¶3.

Here, CYS caseworker, Lauren Keselyak, testified that when Child was

removed from Father on March 14, 2014, CYS placed Child with a foster

family, with whom he remained at the time of the termination hearing. N.T.,

1/7/205, at 14–15. She testified that "[t]hings are going well for him." *Id.*

Keselyak was asked "whether or not in a reasonable period of time

[birth parents] would be able to primarily care for this child?" N.T.

2/11/2015 at 16-17. With regard to Father, Keselyak replied:

> Since the time of [Child's] placement [Father] had been in and out of incarceration. While he was not incarcerated, he continued to make poor decisions. He consumed alcohol and he did not comply with the permanency plan. At this time [Father] does not have stability in his own life and cannot provide stability for that of his son.

---

[14] We note that Child, born in June, 2011, was in foster care from June 7, 2012, to January 29, 2013, and from March 7, 2014. Therefore, at the time of the court's July 15, 2015 opinion, Child had been in foster care for a total of approximately two of his four years of life.

*Id.* at 17. *See also* Petitioner's Exhibit 15 ("Best Interest Statement,"

1/2/2015, signed by Keselyak). She further testified:

> [Father] and [Child] do enjoy seeing each other. They are bonded. They love each other and it's just, it's an obvious bond between them. [Father] does come and he visits regularly with his son. He does well with him at the visits. At this point sometimes [Child] does act up and [Father] does not want to correct him because he feels bad because he only gets to see him once a month. But there is a strong bond between the two.

N.T., 1/7/2015, at 25. Keselyak went on to opine:

> Although there is a strong bond between [Father] and his son, it's in the best interests of the child not to have to wait for his parents to gain any sort of stability. He has basically been waiting around since 2012 for his father to gain stability and he has not. The child deserves some permanency in his life.

*Id.* at 25–26.

In addition, the orphans' court judge asked Cambria County social

worker, Gina Saly, whether it would be "detrimental to this child if the

father's rights were terminated to him?" N.T., 2/11/2015, at 48. She

answered:

> Research suggests when children are younger if that bond is broken at a younger age, it is not detrimental but I don't know if we can say how detrimental to him it would be.

*Id.*

In light of the above testimony, the record supports the orphans'

court's determination that it would be in Child's best interest if Father's

parental rights were terminated. While the evidence showed the existence

of a bond, the court properly considered Child's need for permanence and

stability. **_See Adoption of C.D.R., supra_**, 111 A.3d at 1220.  In **_C.D.R._**,

this Court reasoned:

> Admittedly, Child loves Mother, and Mother is correct that there was no evidence presented during the hearing that Child is bonded with his current foster family. Further, there was no testimony as to whether or not Child's current foster placement is pre-adoptive. However, these concerns are outweighed in the instant case by Mother's repeated failure to remedy her parental incapacity, and by Child's need for permanence and stability. **_See T.D._**, [949 A.2d 910, 920-923 (Pa. Super. 2008)]; **_J.M._**, [991 A.2d 321, 325 (Pa. Super. 2010),] (quoting **_In re Adoption of R.J.S._**, 2006 PA Super 127, 901 A.2d 502, 513 (Pa. Super. 2006))("'The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.'"). Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent. **_See M.E.P._**, [825 A.2d 1266, 1276 (Pa. Super. 2003)] ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted). Regrettably, Mother is not entitled to relief.

**_Id._** at 1220.  Based upon the evidence presented in this case, the same

rationale applies here:  Concerns about the Father-Child bond are

outweighed by Father's inability to remedy the conditions that led to Child's

removal within a reasonable amount of time and Child's need for stability.

Accordingly, because we conclude that the orphans' court did not

abuse its discretion by involuntarily terminating Father's parental rights

pursuant to Section 2511(a)(5) and (b) , we affirm the order of the orphans'

court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/20/2016</u>